UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 3:19CR189 (KAD) |
| v. | |
| PAUL M. CAMARA, JR. | November 22, 2022 |

## **GOVERNMENT'S SENTENCING MEMORANDUM**

The government respectfully submits this memorandum to aid the Court in connection with the upcoming sentencing of defendant Paul M. Camara, Jr. ("Camara"), scheduled for November 29, 2022, at 2:00 p.m. On July 17, 2019, Camara appeared before the Court, waived indictment, and pleaded guilty to a two-count information charging him with one count conspiracy to restrain trade, in violation of 15 U.S.C. §1, and one count conspiracy to commit wire fraud, in violation of 18 U.S.C. §1349. Doc. No 1. The defendant's guilty plea was entered pursuant to a plea agreement that was executed by the government and the defendant on the same day. Doc. No. 5. The parties subsequently entered into a plea agreement supplement on November 15, 2022. Doc. No. 64.

On September 28, 2022, the Court sentenced co-defendant Thomas F. Langan ("Langan") to one year and a day's imprisonment, a $20,000 fine, and $480,900 in restitution, and co-defendant Langan Insulation LCC ("Langan Insulation) to a $150,000 fine and $489,000 in restitution. On November 4, 2022, the Court sentenced co-defendant Axion Specialty Contracting LLC ("Axion") to a $1,001,989 fine and $313,121 in restitution. On November 21, 2022, the Court sentenced co-defendant BC Flynn Contracting Corp. ("BC Flynn") to a $300,000 fine and $1,062,155 in restitution. Flynn's sentencing, originally scheduled for the same day, has been continued.

Because of the Court's thorough familiarity with the facts and circumstances of the offense conduct, which is also set out in Camara's PSR, this sentencing memorandum will serve primarily to address certain issues raised by the PSR, discuss the application of the 18 U.S.C. § 3553(a) factors, and address other sentencing-related issues.

## I. SENTENCING GUIDELINES CONSIDERATIONS

The government respectfully disagrees with the PSR's Guidelines calculation. The government summarizes its position below, which is set out in greater detail in Addendum 1 to the PSR.

Loss

The government joins Camara in strongly objecting to the inclusion of paragraphs 18-25 in the PSR, which summarizes the offense conduct in the case of *United States v. William A. Sacco*, 3:22CR27 (KAD). The government did not charge Camara with this conduct (the "Sacco conspiracy") and did not propose its inclusion in the offense conduct.

Contrary to the PSR's conclusions, the government does not agree that the conspiracy between Camara and Sacco should be considered relevant conduct to Camara's bid-rigging activity. Under U.S.S.G. § 1B1.3(a)(2), relevant conduct includes "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction." The PSR does not conclude that the Sacco conspiracy constitutes a "common scheme or plan" as the big-rigging conspiracy to which Camara pled. *See* U.S.S.G. § 1B1.3 n.5(B)(i). Rather, the PSR concludes that the Sacco conspiracy is relevant conduct because it is part of the *same course of conduct* that is sufficiently connected or related to the big-rigging conspiracy as to warrant the conclusion that they are part

2

of a single episode, spree, or ongoing series of offenses. PSR ¶ 96; U.S.S.G. § 1B1.3 n.5(B)(ii). "Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3 n.5(B)(ii).

> In the instant case, the relevant conduct conspiracy to commit wire fraud was committed by Mr. Camara, using Axion, to increase his profit via change order fraud with William A. Sacco, an employee of the victim mechanical contractor; this offense spanned over years and occurred during the same time period as Count 2 of the Information. Thus, both frauds appear to be an ongoing spree of fraudulent conduct committed by Mr. Camara. As such, the uncharged wire fraud conspiracy is considered the same course of conduct under the guidelines and the loss is added to that of the charged conspiracy for the purpose of calculating the advisory guideline range.

PSR ¶ 94.

Merely because there is some temporal or minor factual overlap among the two conspiracies, however, does not make it relevant conduct. *Cf. United States v. LaBarbara*, 129 F.3d 81, 87 & n.3 (2d Cir. 1997) (noting, while acknowledging some similarities in two crimes, that "embezzling from the union is dissimilar from accepting gratuities from employers in exchange for favorable terms" and disavowing a "broad" application of U.S.S.G. § 1B1.3(a)(2)).

The Sacco conspiracy and the big-rigging conspiracy are not similar. The former involved two individuals who conspired to submit inflated change orders to one victim (a mechanical contractor who is not a victim in the bid-rigging conspiracy) to facilitate under-the-table payments from Camara to Sacco at the mechanical contractor's expense. The purpose of the conspiracy was not to increase Axion's profits directly or to enrich Camara directly, but rather to make payments to Sacco or for Sacco's personal benefit. In contrast, the bid-rigging conspiracy occurred among four individuals at three insulation contractors to allocate contracts among them and to help secure

higher bid prices; the victims were multiple project owners. The aim of the bid-rigging was to fraudulently benefit all of the insulation companies, rather than directly lining the pockets of any particular individual. In any case, Sacco was not a participant in the big-rigging conspiracy; none of the other defendants in the bid-rigging conspiracy (other than Camara and, indirectly, Axion) were involved in the Sacco conspiracy. Moreover, the bid-rigging occurred among competitors, whereas Sacco was a customer of Camara's. Finally, unlike in the bid-rigging conspiracy, Sacco's employer was not a participant in the Sacco conspiracy and was in fact its victim. For all of those reasons, as well as for substantially the same reasons Camara outlines in pages 23-31 of his sentencing memorandum, the government believes that the Guidelines loss should be less than $1.5 million and paragraphs 18-25 (concerning the Sacco conspiracy) should be stricken from the PSR.

Sophisticated Means Enhancement

The government also disagrees with the PSR's recommendation not to include the enhancement for sophisticated means, pursuant to USSG §2B1.1(b)(10)(C), and set out in Addendum 1 to the PSR. Camara provided a phone registered to and paid for by Axion to Flynn ("Axion phone"), the purpose of which was to mask their communications about the scheme by creating the appearance that the calls were between Axion employees. PSR ¶ 15. The enhancement should apply because the defendant's acquisition of the Axion phone for Flynn, and his reliance on that phone for contacting Flynn, is a more sophisticated act of concealment than the use of a "burner" phone in an otherwise unsophisticated criminal offense. A "burner" phone would normally merely obscure or anonymize a defendant's phone with co-conspirators. By ensuring the "Axion" phone was registered to Axion, the Camara and Flynn deliberately created the false appearance that their communications about the conspiracy on the phone were

4

unremarkable calls between co-workers. The conspirators took these steps not only to conceal the true extent of their communications with each other, but to make detection of the crime more difficult. Indeed, the government had not identified the number associated with the Axion phone prior to the execution of the premises search warrant in March 2018.

Camara rightfully points out the government did not advocate for the sophisticated enhancement at co-defendant's Thomas F. Langan's sentencing. Def. Memo. at 30. Langan provided a Langan Insulation telephone (the "Langan phone") to co-conspirator DeVoe for similar purposes. Camara's use of the Axion phone, however, cannot be neatly compared to Langan issuing a phone to DeVoe. Upon reviewing the contents of the Axion phone, the government recovered hundreds of inculpatory text messages, including numerous pictures of bids, and identified over five hundred phone calls between Camara and Flynn on the Axion phone. In contrast, the government did not uncover any inculpatory communications between Flynn and Camara on Flynn's registered phone. While DeVoe and Langan used the Langan phone, they just as frequently communicated using a phone registered to DeVoe. Thus, unlike DeVoe and Langan, Camara and Flynn were far more diligent about only using the "Axion phone" for their inculpatory communications. Given the use and scope of the Axion phone, the Court should apply a sophisticated means enhancement to Camara (and to Flynn).

Ten or More Victims

Lastly, to the extent that the Court agrees with probation's assessment that an enhancement for more than 10 victims is warranted, the government moves to depart downward to give effect to the parties' plea agreement. *United States v. Fernandez*, 877 F.2d 1138, 1145 (2d Cir. 1989). Camara agreed to plead guilty for his role in the bid-rigging conspiracy more than three years ago. At that point, the investigation had not established with specificity which parties in the insulation

contracting chain were victimized by the conspirators' actions, and the parties did not contemplate that an enhancement for more than 10 victims would apply.

## II. APPLICATION OF FACTORS UNDER 18 U.S.C. § 3553(a)

### A. 18 U.S.C. § 3553(a)

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];
> (5) any pertinent policy statement [issued by the Sentencing Commission];
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

### B. Application of 3553(a) Factors

In this case, the government believes that the Court should focus on the seriousness of the offense, the need to promote respect for the law, and to advance general deterrence.

As reflected in the PSR and Exhibit 1, the bid-rigging/fraud conspiracy spanned a nearly seven year period that affected 34 jobs and nearly $39 million in projects. Camara coordinated bids primarily with co-conspirator Michael Flynn to take turns winning bids on these projects. PSR ¶ 13. This conduct was not a momentary lapse in judgment by Camara, but rather a concerted

6

effort that continued for years. Camara's involvement began while he was employed at another insulation company and continued after he helped found Axion in 2012. Moreover, this was not a victimless crime. The victims were municipalities (Meriden, Stratford, Bridgeport, West Haven, Hartford), public and private Connecticut universities (Central Connecticut State University, University of Connecticut, Yale University), hospitals (Stamford Hospital, Danbury Hospital, Bridgeport Hospital), defense contractors, private companies, and others. The victim impact statements—which the government submitted in connection with Tom Langan's sentencing in Case No. 3:20CR14 Ex. 3, *see also* PSR ¶ 30, and incorporates by reference herein—explain how the bid-rigging hurt economically-challenged cities in Connecticut and their taxpayers and university research and educational efforts.[1] At least one victim discussed a nonfinancial harm for the bid rigging, including the project owner's ability to ensure that honest companies compete on a level playing field. *See* Statement of UConn, Doc. No. 3:20CR14 (KAD), at 1-2.

The Court's sentence, therefore, must also promote respect for the law. Bid rigging—particularly of the scale and duration that occurred here—is a serious offense that should be addressed in a way that will encourage (not discourage) competitors to submit independent bids to win jobs. More particularly, subcontractors should not get the message that factors such as industry pressures, pervasive uncharged fraud, or other customs in the construction industry make such bid rigging acceptable.

Lastly, any sentence should reflect the need "to afford adequate deterrence to criminal conduct" by other potential offenders. 18 U.S.C. § 3553(a)(2)(B). Bid-rigging and fraud-based crimes, like the one perpetrated by Camara, are very difficult to detect and investigate. These crimes consist of secret agreements between individuals who are motivated to conceal their

---

[1] The government has submitted with this sentencing memorandum an additional victim impact statement letter from the City of West Haven. *See* Ex. 3.

criminal activities. The difficulty in detecting these crimes is highlighted by the fact Camara and his co-conspirators avoided detection for nearly seven years. The government spent significant resources to investigate and charge all four individuals and three companies that pled guilty, as well as two additional related defendants (Richards and Sacco). Thus, the Court's sentence should advance the sentencing purpose of deterring others of engaging in similar fraudulent and anticompetitive conduct.

## III. FORFEITURE

On July 17, 2019, Camara entered into a forfeiture agreement regarding funds seized from Camara's bank accounts and the release of a *lis pendens* on Camara's residence (Case Nos. 3:18-MC28 (SALM) & 3:18CV550 (SRU)). Pursuant to the agreement, upon Camara's sentencing, the funds will be returned and the *lis pendens* will be removed as a result of the government's settlement with Axion Specialty Contracting, LLC ("Axion"), which pled guilty to one count of conspiracy to restrain trade on August 3, 2022 (Case No. 3:22-cr-157 (KAD)).

## IV. THE COURT MUST ENTER RESTITUTION

Pursuant to 18 U.S.C § 3663A, the Court must order restitution to the victims of the fraud conspiracy and, pursuant to 18 U.S.C. § 3663, may order restitution to the victims of the bid-rigging conspiracy (the victims and loss are the same regardless of count). The government recommends that the Court apportion restitution based upon which co-conspirator won the insulation contract project and pursuant to the procedures set forth in 18 U.S.C. § 3664(h), to reflect the level of the defendant's contribution to the victims' losses. The government recommends that Camara pay $313,122 in restitution, on a joint and several basis with Axion, in the amounts and to the victims identified in the Exhibit 2.

## V. CONCLUSION

For the reasons stated above, the Court should sentence Camara to reflect the seriousness of the crimes he committed, to promote respect for the law and general deterrence, and to compensate victims.

Respectfully submitted,

_____/s/_____
Daniel Glad
Acting Chief, New York Office
U.S. Department of Justice
Antitrust Division


_____/s/_____
Phil Andriole
Milosz Gudzowski
Trial Attorneys
Department of Justice
Antitrust Division


_____/s/_____
David Huang
Assistant United States Attorney
District of Connecticut

CERTIFICATE OF SERVICE

       I hereby certify that on November 22, 2022 a copy of the foregoing GOVERNMENT'S SENTENCING MEMORANDUM was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. In addition, a copy was emailed to:

    Michelle Murphy, Senior U.S. Probation Officer

                                 /s/
                            PHIL ANDRIOLE
                            TRIAL ATTORNEY